Good morning, Your Honors. Haitham Balut for Respondent, Mr. Rojas, Petitioner, who's sitting behind me with his family. First, we have the fair trial. Then we hang him, said Judge Roy Bean in Texas back in the 19th century. Compare this with our own judge in this case, who said verbatim to Mr. Rojas on the first time she met him in the court without a lawyer at a master hearing. She said verbatim, So what I want to tell you so that you don't have any false hope, that is, that you are going to be deported after your hearing, even if you prove what you said to the asylum officer. Do you understand that? And he says, yes. Judge says, thank you. Matter concludes. Amazing. Amazing. In today's age, what happened to non-biased judges? What happened to hearing evidence before deciding a case? Aren't we supposed to let the asylum seeker say their piece, tell us their stories before we get to this judgment of, you're going to be denied no matter what you said and whatever you prove? I urge you, Your Honors, to send a strong message, especially in today's environment, that a foregone conclusion, that an asylum application will be denied, hanged. Let me ask you this. So she proceeded to conduct a hearing, correct? Eventually, yeah, after that hearing. There was an evidentiary hearing. Sure. So did the hearing at that hearing, was he able to present his case? Well, here's the issue that we raised in our brief. He was interrupted multiple times. He was told to answer yes or no to questions that don't call for yes or no answers, especially to direct examination, not even allowed to ask yes or no questions on direct examination, yet the judge insisted that he says yes or no, trying to tell her why I moved, why I was afraid to stay in this location. I didn't see in your brief your indication of what information your client would have wanted to have put on that he was prevented from being put on. The only indication I recall is that the attorney decided not to have one witness testify, who he agreed would be cumulative. Was there information that your client wanted to present that he was prevented from doing so? Appreciate the question, Judge Akuta. One thing you got to understand, that he was not allowed to say or did not, let me back up for a second, I was there. The whole setting was so hostile that we could have shown why I moved to a different town by allowing him to explain why he moved, how long he stayed, why he relocated again. Those issues were not really flushed out because she insisted on yes or no answer. The wife who testified, sorry, the partner at that time, wife now, was also treated the same way. Look, you're not answering the question. So we could have shown a lot by proving why he moved to different places. So that's one thing that you were not able to flush out and we would have shown. Does that answer your question? So the main piece of information was the motivation for the moves? That's right, Your Honor. Did you attempt to file some sort of a document showing what your client would have testified to had he not been interrupted? Like a proffer that you have in a district court. The asylum application itself had more details that would have been flushed out and that was not testified to. So in a way we had it done, yes, with a pre-filing of the asylum application. And that's where the judge would not have it. Did the judge say that she was looking at that application or said, I'm not going to pay any attention to it or anything like that? Did not say that. Did not say that. But just the demeanor, the hostility that she has shown, the prejudgment of the application is really what, in my view, affected the outcome of that case. So we could deal with it on a de novo review based on a due process violation. And if the court wants to continue on and go to the facts of the case, which really also would clearly show that he suffered past persecution, and if I may get to that, when we turn to the facts of this case, the REAL-ID Act requires that the testimony be credible, persuasive, and sufficient. The BIA had issues only with a sufficiency prong because that's what they said they have an issue with. First, let's talk about those facts. The IJ found that Mr. Rojas was credible, so everything he said is true. No one disputes the facts that Mr. Rojas reported drug dealing by a drug dealer, Rana, who was using children to run the drugs to buyers. Children as old as Mr. Rojas' kids, and that's really what prompted him to report. Only two police officers knew of his identity, his name. He had no enemies.  Four months later, he began receiving calls, threats, calling him a snitch, snitch in direct reference to the fact that he reported a drug dealer. Nothing else. I don't know where else we could – where we could make a different conclusion than this. That's when he – before even that, he felt – he felt that he did – he felt threatened. He asked to be transferred. He was transferred to a different town. Even then he felt threatened. Then he quit his job completely as a civil patrol. He went to a different town an hour and a half away to his parents' home, and for eight months he used different routes, different cars to get to his factory job. And then they caught up with him. He was shot six times. Lucky he survived. And what's the information – this is what I understood the IJ to be concerned about. What's the information that connects the drive-by shooting with the threats or the report? Thank you. The threats did not stop, Your Honor. The calls kept coming. He just wouldn't answer them. It doesn't mean the threats stopped. So there was some confusion with the timeline. So they stopped when he moved in March 2014, or did he still get threats? He kept coming threats, but maybe not much after March 2014. But here's the key. People were asking about him in the new town. He knew nothing about these people. But not threats, he reported. He testified they weren't threats. They were not threats, but people were asking about him. What can we make out of that? If he doesn't know these people, they're asking about his whereabouts and about him, and then the shooting happens. So even that's the connection. The shooting happens in September, right? Shooting happened in September. And so the IJ was saying what connects, or there isn't anything that connects this shooting in September to what had happened with the police so long ago in October, I guess. And this is where the judge goes wrong. She failed to know that the calls kept coming and people were asking about him. That's the connection that the judge completely ignored and the BIA agreed with. I reserve a few done with. That's fine. Thank you. Thank you. Again.  Again, I'm Lori Warlick here on behalf of the United States Attorney General General Respondent. The Court should deny this petition for review because Mr. Pareja has not established that the alleged due process violations resulted in any prejudice to him. Do you think there was a due process violation? I don't. You don't? Why not? Because the immigration judge is clear that she was no-nonsense. She ran a tight ship. Well, it's one thing to be no-nonsense and to run a tight ship, but you usually don't tell a petitioner or a litigant that, hey, you're going to lose. I don't — I believe that's somewhat of a mischaracterization of her statement. Well, that's essentially what she told him. She told him that based on what he had put forth so far — You don't have a claim. — that the law as it stands is not going to support your case. Right. You're out. But he came forward. He had his — Going to be deported. If you can't meet the legal requirements for asylum or withholding of removal or cap protection, given that he had conceded removability or at least — so seeking — in his credible fear interview, he had acknowledged that he was not eligible to remain in the country. What did she base that on? Just his application? The credible fear interview where he said that he had been threatened a number of times due to a single isolated incident, and then much later he was shot at. Note — we should be careful not to say he was shot. He was shot at, but he was not injured from anything like that. Apparently, the only injury was when he sought to get away from the incident, which doesn't — does not mean to minimize what he experienced. It's just that the way the law is written, those do not necessarily — they don't really — that would not make a substantial evidence case for this, that it compels a contrary conclusion. Well, we — you know, threats combined with other activity can be — Right. Threats can — Can amount to past persecution. Right. And I believe that — The case was pretty clear on that. Yes, I'm sorry. I'm sorry to interrupt. And I believe there — Mr. Prada has attempted to make a case that the shooting was the extra act, so to speak, that that was the extra. But the point is, is that it can't be connected. And — Well, let me ask you this. So he — Mr. Prada tells a story that he reported this drug dealing to the police. He subsequently gets a threat, threatening calls. Then inquiries as to his location, and then he's shot at. And he said, you could tell, res ipsa loquitur. You know, this is — they are connected. And we said in Madrigal that the government should come up with a — if there's circumstantial evidence supporting the story, the government should have at least an equally plausible explanation. So I didn't see the government having a plausible explanation of this sequence of events in the briefing. Is there one? I don't believe that they advanced one yet. But the point was that it was very clear that — of course, he was found credible. The immigration judge found him credible. But I want to step aside for a moment. But the explanation for this sequence of events, I mean, there doesn't seem much dispute that if you get threatening phone calls that say you're a snitch, it seems reasonable to relate that back to his report of the drug dealing that he saw. Well, it could be. That could be a plausible explanation for it. But it's not — we're talking about substantial evidence. But what's an equally plausible explanation for that series of events? My first thought, well, he didn't recognize anyone in the car. He didn't recognize the car itself. They never said anything to him. And my first thought was, well, what if they thought you were someone else? What if this was a gang initiation? What if this was, let's shoot someone, a stranger on the street? Or what if — I mean, there's a lot of what ifs that you can put forward. And unfortunately, I mean, of course, like I said, I don't mean to minimize his experiences. But the point is, when the credibility finding does not quite get Mr. Pereja as far as he would like, the immigration judge found him credible, which is important when we're talking about this alleged due process violation. Despite all the issues with testimony, despite how many times she had to admonish him to actually answer the question and not go meandering down into stuff that happened many years ago that wasn't relevant, the immigration judge found him credible. She included in her credibility that he did not know who shot him, that he did not know how they got his phone number, that she — he said, I don't know if Rana saw me in the car when they did the show-up identification. They could have seen him then. It doesn't necessarily mean that the police gave him the number — gave this drug dealer the number. Of course, it could have been. But the point is, is that it's all speculative. And even my theories that I put forward, that's all speculation as well, because there's no evidence of any of it. There's no evidence to point to one or the other. So the government's explanation of why he was shot at was it was a random happening? That's not — I wouldn't say that the government is trying to put — I'm not trying to put forward a conclusive explanation. I'm just saying that when you don't know who shot at you, they didn't say anything, you didn't recognize them. And it was six to eight months after the threat. Do we have any case law that you have to have that much knowledge about who your persecutors might be? Well, I don't believe that there is case law about that, except that — to say that the — there must be specific and detailed and plausible testimony and evidence about the issue. In Montreal, we sent it back so the government could. Right. But in that — To show some other plausible explanation for what happened. Yes, the court found that the evidence didn't — but they didn't find that there was any — No, they sent it back. Right. They sent it back. But not because there was a — Because we looked at all the circumstantial evidence and — But it's important to note that the court didn't — And we said that the IJ had to credit it, but that the government could show another or conclusive — Clause-wise, make sure. — explanation as well, which the government hadn't done, so we sent it back and said government has to have its chance. Well, I believe that it's important to note here that the court in that decision, though, did not find that the evidence compelled a conclusion that the person suffered past persecution. Instead, it was that the agency was inappropriately reviewing the incidents in isolation and not in the totality of the circumstances and sent it back because — Well, yes, they sent it back. Of course. The government could — And, of course, the court could send this one back, too. But the point is that it's up to the court to decide if the evidence compels the conclusion contrary to what the agency reached. And, respectfully, it doesn't, because in Madrigal, the — he was a military officer in the Mexican Army. His face was shown on national television transferring members of Los Cetas to a different place. So the facts in Madrigal are quite — Very different. — are different, but there's a legal principle that you can derive from Madrigal that seems to apply here. Well, I would — There's far more concrete evidence of the connection between the threats and the harm than in this case. So the speculation in this case is far greater than it was in Madrigal. And in the — in this case, the length of time between the single report that he made to the police officer — we should be careful not to characterize this as he saw this drug cartel using children, plural, throughout this — in a pervasive manner in this town. He may have, but that's not what he testified about. He said he saw it one time, and it bothered him, as it should. And he went and told law enforcement about it. And he tried to remain anonymous, but he's not sure if they knew who he was because of his auxiliary role with law enforcement. And a year later, again, there were threats that were made against him approximately one month — for one month, approximately four months after this report. But it was a year later, and it seems like he's relying on — that he moved to this different town where his parents lived, and people were asking about him, but they — again, they were not threatening him, as he admitted, as he conceded. And the stranger in a strange town usually gets asked about. So it's — it doesn't necessarily support the point. And again, we're looking at the totalitarian circumstances and all these pieces put together and whether it compels a conclusion different than what the agency reached. Before I run out of time, I did want to point out that, yes, the immigration judge, as I explained, was terse and at times probably impatient, but the court — the Supreme Court's already — already explained in Likety, I think is how it's pronounced, that — that expressions of impatience, dissatisfaction, annoyance, and even anger that are within the bounds of what an imperfect men and women, even those that become judges — again, we're human — sometimes — may sometimes display is not a basis for a due process violation. Of course, I would say that the points that this immigration judge was saying was within the bounds of her attempt to keep the courtroom running on schedule. She's on a detained docket. And when Petitioner came in and was not following her instructions about giving a full date, including the year at the first reference to a date, about answering the yes-or-no question with a yes-or-no, but contrary to the indication given by Petitioner, she didn't say yes or no and that's it. She said give a yes-or-no answer, and if there's a follow-up necessary, your client — your attorney will do that. He was counseled. And she even — I will point out that she even, at one point, there was a moment when he gave the incorrect date of the course of events, which might have led to the board's inadvertent reference to the years being off. And the DHS attorney wanted to mention that, wanted to go down that hole. And the immigration said, no, he meant — basically, he meant this. And so there were times — I'm about to run out of time, if I may conclude. She — she, on page 166, said — kind of explained that, no, he was just — that was just a misstatement to the DHS attorney. She also explained that she only wanted to understand everything in context, and she needed the timeline to be clear and concise and to answer the questions so she could understand his claim. She also invited his counsel to return and ask more questions after she gave her series of questions. She invited him to do a redirect. He didn't take it. The — I don't believe. And when Mr. Parejas's then-partner, now-wife, testified, she understandably became upset while discussing this — this experience that her husband had endured. And at the conclusion of it — I mean, this is certainly not conclusive evidence, but — of the underlying merits of the case, but about the judge's attitude, she gave — gave her a tissue. I mean, she was not intending to be unkind or prejudicial to this case. She instead was simply trying to run her courtroom efficiently. So with that, I ask the Court to deny the petition for review. Thank you. Thank you. We had some time left. Thank you. So I've been doing this for 26 years. I've been before many judges that's so great and not so greatest. And I have never, ever heard a judge say, you're going to get denied. You're going to be deported. So being impatient is one thing, and we understand that. Judges are busy. But to have a predisposed intentions to deny your asylum is not acceptable, and I have never seen it in 26 years. What did that judge have before when she said that? Had she read the record? Oh, perfect question. She was disputing the finding of credible fear that the asylum officer has determined. Now, we entrust most of the grants of asylum in this great country to the asylum officers. And this judge said, I don't buy it, right off the bat. That is also an indication of her predisposition, Your Honor. As to the one year, everybody talks about one year. They look at this one year in isolation. It wasn't in isolation. This one year passed with incidents connected to the threats, to looking for him, to shooting. Madrigal is right on point. She says an attempt that the Madrigal court specifically said that a murder attempt rises to the level of past persecution. Assault threatening life itself constitute persecution. What happened to that principle? And I don't know why the government is completely ignoring Madrigal. Oh, sorry, I'm out. You're out of time. Thank you. Thank you, counsel. We appreciate your arguments in this case, interesting case. And the matter is submitted.
judges: Siler, Paez, Ikuta